## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **W. JAMES MAC NAUGHTON,** | No. 09–cv–5450 (KM)(MAH) |
| **Plaintiff *pro se*,** | |
| **v.** | **OPINION** |
| **SHAI HARMELECH *pro se*, CABLE AMERICA, INC., d/b/a SATELLITE AMERICA and USA SATELLITE & CABLE, INC.,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, W. James Mac Naughton, an attorney, was retained by the defendants, Cable America, Inc., d/b/a Satellite America, USA Satellite & Cable, Inc. (together "Cable America"), and Shai Harmelech. Mac Naughton represented the defendants in a matter before the United States District Court for the Northern District of Illinois. This New Jersey federal court action, now pending for some seven years, concerns nonpayment of an outstanding balance for legal services. The original debt, modest by the standards of federal court litigation, has been overshadowed by litigation over the aggressive procedures by which Mac Naughton sought to collect it.

Now before the Court are three motions: Defendants' motion to dismiss Mac Naughton's Second Amended Complaint (ECF No. 382)[1]; Mac Naughton's motion for summary judgment under Federal Rule of Civil Procedure 56 (ECF

---

[1] The motion to dismiss, filed by Harmelech, has been joined by Cable America. (ECF No. 378)

No. 379); and Cable America's motion for summary judgment under Rule 56.[2]
For the reasons stated below, I will deny the motion to dismiss, grant in part
and deny in part the summary judgment motions, and dismiss counts one,
two, and five without prejudice as moot.

## I.   BACKGROUND

I here recite the essential chronology. Further facts are referred to in the
legal discussion.[3]

_____

[2] Harmelech does not appear to have responded to Mac Naughton's motion or
joined Cable America's motion.

[3] Defendants, in support of their factual contentions, cite some deposition
excerpts, but cite primarily to their own answer. The opponent of a properly supported
motion for summary judgment cannot rest on its pleadings. I have nevertheless
reviewed the record of the case in order to determine whether a genuine, material
issue of fact is presented.

Citations to the record will be abbreviated as follows:

"2AC" — Second Amended Complaint (ECF No. 61).

"2AC Ex." — Exhibits to the 2AC (ECF Nos. 61–1 to 61–6).

"Answer 2AC" — Answer, Affirmative Defenses and Counterclaims to 2AC (ECF
No. 71).

"Def MTD" — Defendants' Motion to Dismiss the 2AC (ECF No. 382).

"Def MTD Reply" — Defendants' Reply Brief in Support of their Motion to
Dismiss the 2AC and attached exhibits (ECF Nos. 391, 391–1).

"Pl MSJ Br." — Brief in Support of Plaintiff's Motion for Summary Judgment
(ECF No. 379–2).

"Def Opp. MSJ" — Defendants' Brief in Opposition to Plaintiff's Motion for
Summary Judgment (ECF No. 388).

"Pl Facts" — Plaintiff's Statement of Material Facts (ECF No. 379–3).

"Pl MSJ Ex." — Plaintiff's MSJ Exhibits (ECF Nos. 379–6 to 379–38), attached
to the Certification of W. James Mac Naughton ("Mac Naughton Cert.") (ECF No. 379–
4).

"Def MSJ Br." — Brief in Support of Defendants' Motion for Summary
Judgment (ECF No. 380–3).

"Pl Opp. MSJ" — Plaintiff's Brief in Opposition to Defendants' Motion for
Summary Judgment (ECF No. 383).

## A.  Parties

The plaintiff, W. James Mac Naughton, is a New Jersey resident, licensed to practice law in this State. (Def Facts ¶ 1; Pl Facts ¶2) He has over three decades of experience with the satellite television industry. (*Id.*)

Defendant Shai Harmelech is an Illinois resident. (Def Facts ¶ 2) Cable America, Inc., and USA Satellite & Cable, Inc., are Illinois corporations with their principal places of business in Illinois. (Def Facts ¶¶ 3–4) Defendants distributed Russian language programming over satellite TV in the Chicago metropolitan area. (Pl Facts ¶ 8)

## B.  The Representation

In 2009, defendants were parties to a case in the Northern District of Illinois captioned *Russian Media Group, LLC v. Cable America, Inc. et al,* Civ. No. 06–3578. (Pl Facts ¶ 9; Def Facts ¶ 6) (I will refer to this as the "Illinois action.") In May 2009, defendants retained Mac Naughton to represent them in that case. The retainer agreement provided that Mac Naughton would charge $300 per hour plus costs, expenses, and disbursements. (Pl Facts ¶¶ 14–15; Def Facts ¶ 6; Pl MSJ Ex. A (ECF No. 379–6)) Expenses were defined to include out of pocket costs, such as flights, hotels, and meals; interest for unpaid bills was set at 1% per month; and New Jersey was designated as the forum for

---

"Def Facts" — Defendants' Statement of Material Facts (ECF No. 380–1).

"Def MSJ Ex."— Defendants' MSJ Exhibits (ECF Nos. 380–5 to 380–11).

"Pl Response Facts" — Plaintiff's Response to Def Facts (ECF No. 384).

"Harmelech Dep." — Transcript of the Deposition of Shai Harmelech (Pl Ex. CC (ECF No. 379–35)).

"Mac Naughton Dep." — Transcript of the Deposition of W James Mac Naughton (Def Ex. B (ECF No. 380–6)).

"Korniczky Dep." — Transcript of the Deposition of Paul J. Korniczky (Pl Ex. BB (ECF No. 379–34)).

"30(b)(6) Dep." — Transcript of the Deposition of Shai Harmelech on behalf of Cable America (Pl Ex. AA (ECF No. 379–33)).

disputes arising out of the representation. (Pl MSJ Ex. A) During the representation, Mac Naughton was privy to what defendants regarded as privileged and confidential information, including the fact that defendants were in violation of an escrow order entered by the Illinois federal court. (Pl Facts ¶ 18; Def Facts ¶ 7) Paul Korniczky of the Chicago law firm Leydig, Voit & Mayer, Ltd., served as cocounsel with Mac Naughton in that Illinois action, and represented defendants in their negotiations with Mac Naughton over fees owed. (Pl Facts ¶ 17)

Mac Naughton represented the defendants between May 7, 2009, and July 16, 2009. During that time, he billed defendants for 333.2 hours of work at $300 per hour and $8,712.28 in out of pocket costs. The total bill was $108,132.28. (Pl Facts ¶ 20; Def Facts ¶ 8; Pl Response Facts ¶ 8) In June 2009, USA Satellite delivered to Mac Naughton three checks totaling $37,000, but these were returned by their bank for insufficient funds. (Pl Facts ¶¶ 23–24) On July 16, 2009, Mac Naughton suspended work for the defendants based on an unpaid balance of $65,000.[4] (Pl Facts ¶¶ 25–26)

On July 16, 2009, Mac Naughton sent defendants a letter demanding payment plus an advance within a week, and threatening to apply to the court to withdraw from the case. In the letter, he also advised defendants of their right to fee arbitration pursuant to New Jersey Court Rule 1:20A, and asserted an attorney's lien on the papers and electronic files in his possession. (Pl MSJ Ex. E.1 (ECF No. 379–10)) Harmelech refused to pay Mac Naughton, contending that Mac Naughton overcharged defendants.[5] (Pl Facts ¶ 30) In his deposition, Harmelech stated that he did not pursue fee arbitration "because it

---

[4] Through various payments in 2009, defendants had paid down the balance from $108,132.28 to $65,000. (Mac Naughton Cert. ¶ 15)

[5] Defendants continue to contend that they were overcharged in their statement of facts. The deposition testimony to which they cite, however, consists only of Mac Naughton's testimony that he properly billed the defendants. (See Def Facts ¶¶ 25–26 (citing Mac Naughton Tr. 68:20–71:19, 122:22–123:25))

would take too long" and "looked complicated." (Harmelech Dep. 142:24–143:12) Harmelech also stated that he could have paid Mac Naughton from his own funds or a bank loan but did not because he felt Mac Naughton "screwed" him and it was "a scam." (Harmelech Dep. 140:15–141:3, 195:11–196:13)

## C. The Agreements

The period from July 16, 2009, to August 12, 2009, culminated in the execution of a security agreement and promissory note. The parties disagree, however, as to how to characterize this process. Mac Naughton claims merely that "the parties entered into negotiations," while Defendants claim that Harmelech executed the agreements only "[in] response to repeated threats." (Pl Facts ¶ 31; Def Facts ¶ 10)[6] Mac Naughton admits that he advised Korniczky,

---

[6] Defendants cite only to deposition transcripts, but Mac Naughton includes email exchanges between the parties dating from August 2009. (Pl MSJ Exs. F–K (ECF Nos. 379–12 to 379–17))

On August 4, 2009, for example, Mac Naughton wrote:

I am going to file an application to withdraw as counsel by the end of this week. That application will state that I have not been paid a substantial amount of money. Both the Court and RMG will infer that you are at the end of your rope and calibrate their decisions accordingly. Good luck, you're going to need it.

(Pl MSJ Ex. F) On August 5th, Mac Naughton sent an email attaching an itemized bill and explaining that nearly half of the bill was from time spent repairing damage from defendants' ill-advised actions or pursuing strategies with which Mac Naughton did not agree. (Pl MSJ Ex. K) On August 10, Mac Naughton attached a draft of a motion to withdraw that notified the court of the bounced checks and unpaid bills. That email, however, also included a settlement offer with a payment plan, and an offer to file an uncontested motion to withdraw based on "mutual consent." Mac Naughton added:

I am going to get paid, with or without Shai's cooperation. I would prefer to exit on a civilized and gentlemanly note with Shai's cooperation. But if that is not forthcoming, then I will still get paid because getting and collecting on judgments is a subject I know a lot about.

If Shai is going to accept this proposal, then he should wire the first $5K by Wednesday. No wire = no deal.

(Pl MSJ Ex. G) In further emails up until the promissory note and security agreement were signed, Mac Naughton repeated that he would file the original motion to withdraw if the agreements were not signed. (Pl MSJ Exs. I–J)

who still represented the defendants, that if he had to sue to collect the money, he had "the right to use and reveal any of the secrets and confidences of [d]efendants necessary to collect." (Pl Facts ¶ 37) Mac Naughton added that Korniczky understood those "confidences" could include the defendants' delivery of bad checks and their failure to comply with an escrow order in the Illinois action. (*Id.*) Harmelech, testifying on behalf of Cable America, said he was afraid he was "going to look like shit in front of the judge." (30(b)(6) Dep. 235:25–236:14) In his deposition, Mac Naughton explained that he believed the judge in the Illinois case would be unsympathetic to a lawyer who attempted to withdraw based on nonpayment alone. The bounced checks, however, would (he believed) impress upon the court that there were "irreconcilable differences" warranting withdrawal. (Mac Naughton Dep. 96:15–97:4)

Korniczky represented Harmelech and Cable America in the negotiations with Mac Naughton. (Pl Facts ¶ 31) Harmelech told Korniczky that he did not have the money to pay Mac Naughton and wanted to set up a monthly payment plan. (Korniczky Dep. 74:4–17, 75:18–22, 81:2–13) Eventually the parties agreed to and executed a promissory note in the amount of $65,879 with 12% annual interest, a security agreement, and a second retainer agreement. (Pl MSJ Ex. L (ECF No. 379–18))

The security agreement purported to give Mac Naughton "a security interest in in all of the [defendants'] right, title and interest in any and all real or personal property wherever located." It provided that Mac Naughton was authorized to sign on defendants' behalf "any UCC-1 or other documents reasonably necessary to perfect the security interest." (*Id.* at 3 ¶ 1) It also contained a severability clause, and required defendants to pay reasonable attorney's fees and expenses. It selected New Jersey as the forum for disputes arising out of the agreement. (*Id.* ¶¶ 4–5) Additionally, a schedule of payments from August 2009 through March 2010 was attached. (*Id.* at 5)

Mac Naughton filed a UCC-1 financing statement in the State of Illinois immediately after the agreements were signed. (Pl MSJ Ex. M (ECF No. 379–19)) He returned to defendants the property over which he had claimed an

attorney's lien. (Pl Facts ¶56) On August 15, 2009, defendants paid Mac Naughton an initial instalment of $5,000 pursuant to the payment schedule.[7] (Pl Facts ¶ 60)

### D. Further Disputes

Defendants did not make their next scheduled payment in September 2009. (Pl Facts ¶ 61) Mac Naughton notified defendants that all payments were accelerated pursuant to the security agreement. About a week later, he filed a motion to withdraw as counsel and for leave to intervene in the Illinois action as a cross-claimant against the defendants. (Pl Facts ¶¶ 62–63)

On October 2, 2009, Mac Naughton sent out notices of disposition of collateral and scheduled an auction to sell defendants' assets on October 23, 2009, pursuant to Illinois UCC–1 § 9–610 (810 ILCS 5/9–610). (Pl Ex. O (ECF No. 379–21); Pl Facts ¶¶ 65–66; Def Facts ¶ 11) On October 16, 2009, defendants' attorney, Donald Spak, sent a cease and desist letter to Mac Naughton, stating that the Security Agreement was not enforceable under Illinois UCC §§ 9–203 (810 ILCS 5/9–203) and 9–108(c) (810 ILCS 5/9–108) because the description of collateral was supergeneric.[8] (2AC Ex. E (ECF No. 61–5)) Spak also requested that Mac Naughton process a termination statement for the filed financing statement pursuant to Illinois UCC § 9–513 (810 ILCS 5/9–513), which defendants argued was filed without their authorization. (*Id.*) Mac Naughton responded that he disagreed with defendants' legal conclusions and that defendants "gave me a security interest

---

[7] Defendants paid Mac Naughton $10,000 on June 26, 2009, and $2,400 on July 29, 2009 (or June 29 and July 30). This occurred after they had sent the bounced checks but before they signed the security agreement. (Def Facts ¶ 27; Pl Response Facts ¶ 27; *see* Mac Naughton Cert. ¶ 15)

[8] Mac Naughton contends that this was the first time defendants advised him that they regarded the collateral description as too broad. (Pl Facts ¶ 45) Korniczky testified that Harmelech told him at the time they signed the agreement that "he knew it was not a good security agreement" because "[i]t was too broad or too general." (Korniczky Dep. 100:5–15)

in everything they own." (2AC Ex. F (ECF No. 61–6)) Mac Naughton cancelled the auction, but never filed a termination statement. (Pl Facts ¶¶ 72–73)

Defendants claim that despite multiple written warnings, Mac Naughton continued to harass their customers and clients. (Def Facts ¶ 21) Mac Naughton claims that, after receiving the Spak letter, he advised all third parties with whom he communicated that the defendants disputed the enforceability of the security interest. (Pl Facts ¶ 71)[9]

Defendants paid Mac Naughton $8,500 on November 27, 2009, $5,000 on December 29, 2009, and $6,100 on November 18, 2010. (Pl Facts ¶ 76)[10] Mac Naughton states that as of November 14, 2014, defendants owed him $61,942: $48,569 owed as of the last payment in November 2010, and $13,373 in interest. (Pl. Facts ¶ 77; Pl MSJ Ex. Z (ECF No. 379–32))[11] Defendants claim that they paid Mac Naughton $37,000 to make up for the bad checks, but that Mac Naughton did not credit them properly. (Def Facts ¶¶ 27–30)[12] In his

_____

[9] On July 28, 2011, before this case was reassigned to me, Judge Salas temporarily restrained Mac Naughton from contacting Harmelech's customers. (ECF Nos. 119, 122) On March 30, 2012, Judge Salas dissolved those temporary restraints. (ECF No. 167)

[10] Defendants state that they paid only $5,000, not $8,500, on November 27, 2009. (Def Facts ¶ 27) I will use Mac Naughton's numbers, which are more favorable to defendants.

[11] Mac Naughton's per diem interest rate of $9.178, running from the last payment, is equivalent to a per annum rate of less than 12%. Again, because Mac Naughton's calculation is more favorable to the defendants, I will follow his accounting. (See Pl MSJ Ex. Z)

[12] This is one of many instances of defendants' blurring the amount owed under the promissory note with the $37,000 in bounced checks that they sent. (See, e.g., Def MSJ Br. § II.c) Defendants claim to have repaid Mac Naughton the $37,000 that they originally tried to pay with bad checks. They point out that an indictment brought against Harmelech charging him with three counts of bad checks was dismissed once Mac Naughton had received $37,000 in payments. (Def Facts ¶¶ 31–36; Pl Response Facts ¶ 35) That $37,000 figure is the sum of the payments sent from defendants to Mac Naughton after they sent the bounced checks: $10,000 on (or about) June 26, $2,400 on (or about) July 29, $5,000 on August 15, $8,500 on November 27, and $5,000 on December 29, all in 2009, and $6,100 on November 18, 2010. (See Def

deposition, Mac Naughton admitted to applying money paid to him by defendants in November and December of 2009 towards new attorney's fees that he incurred in pursuing defendants for breach of the promissory note. (Mac Naughton Dep. 108:16–109:10) He maintained that he had the right to decide how to apply the money based on the language of the promissory note and the security agreement.[13] (*Id.* at 109:11–25) However, this disagreement does not seem to pose a genuine issue. The accounting records that Mac Naughton himself submitted show that he applied the payments of November 27, 2009, December 29, 2009, and November 18, 2010, to reduce the principal and interest on the promissory note. (Pl MSJ Ex. Z)

**E. Relevant Procedural History**

Mac Naughton brought this suit on October 26, 2009. (ECF No. 1) On February 16, 2010, defendants brought a motion to dismiss the original complaint. (ECF No.8) In September 2010, Judge Sheridan granted the motion to dismiss as to count four, pertaining to the validity of the August 12, 2009 security interest. He held that the description of defendants' personal property was "supergeneric," and that the agreement therefore did not create a valid

---

Facts ¶ 27; Mac Naughton Cert. ¶ 15; Pl Facts ¶¶ 60, 76) But that does not imply that the $37,000, because paid "twice" (once by bad check), may be double counted against the legal fees owed. The promissory note is the focus here, and it was not signed until August 12, 2009. Any payments made before that date are not relevant to whether the promissory note has been repaid. In fact all payments made prior to the signing of the promissory note were applied to reduce the amount owed to Mac Naughton from $108,132.28 to $65,000. *See* note 4, *supra*. That is why the parties entered into a note for only $65,000, rather than the amount originally owed.

Mac Naughton's accounting records show that payments from the defendants after the promissory note was signed were subtracted from the amount owed. As of the filing of this motion, a balance of $61,942 was still outstanding. (Pl MSJ Ex. Z)

[13] The promissory note states that "Maker shall be liable for all reasonable attorney[']s fees and costs arising out of the collection or enforcement of this Note and Security Agreement." (Pl MSJ Ex. L at 6) The security agreement states that "Maker ... agrees to pay Holder's reasonable attorney[']s fees and expenses for all matters arising out [of] enforcement of this Security Agreement." (*Id.* at 3 ¶ 5)

9

security interest under the Illinois Commercial Code. *Mac Naughton v. Harmelech*, No. CIV. 09–5450, 2010 WL 3810846, at *4-5 (D.N.J. Sept. 22, 2010) (ECF No. 35 at 8–10).

Mac Naughton filed an amended complaint the next day (ECF No. 37) and filed the now-operative second amended complaint ("2AC") in December 2010. Defendants filed an answer to the 2AC; that answer includes counterclaims, which are also at issue in these motions.

After this case was reassigned to Judge Salas, Mac Naughton filed a motion for leave to file a third amended complaint. (ECF No. 123) Judge Salas denied that motion on grounds of undue delay and bad faith. (ECF No. 167 at 4–7) Specifically, Mac Naughton attempted to add a new count seeking a declaratory judgment validating an "amended security agreement," which described certain specific certain items of defendants' personal property. (*Id.* at 3–4)[14] Mac Naughton claimed that the language of the security agreement gave him the right to unilaterally amend the agreement, and that he had done so to perfect his security interest. (*Id.* at 5) Judge Salas did not weigh in on whether the contract gave Mac Naughton this authority, but held that he unduly delayed in bringing this claim, and that it was a bad faith effort to circumvent Judge Sheridan's ruling. (*Id.* at 4–6)[15]

After the case was reassigned again to this Court (ECF No. 190), the parties filed the current motions to dismiss and for summary judgment.

## F. The Current Seven Claims and Four Counterclaims

Mac Naughton's 2AC contains seven claims for relief:

-----

[14] In the 2AC, Mac Naughton alleges two causes of action that similarly attempt to remedy the original security agreement. Mac Naughton asks this Court to reform the security agreement or grant him an equitable lien. (2AC Counts 6, 7)

[15] Judge Salas noted that "[p]laintiff has failed to direct this Court to any case law in support of his contention that he is entitled to unilaterally amend the central agreement to a litigation after that litigation has commenced, much less after that agreement has been deemed invalid." (*Id.* at 6)

10

Count 1: violation of the 720 ILCS 5/17–1 prohibition against issuing bad checks (2AC ¶¶ 30–34);

Count 2: fraud (2AC ¶¶ 35–41);

Count 3: breach of the promissory note[16] (2AC ¶¶ 42–46);

Count 4: declaratory judgment on the sufficiency of the security interest language in the security agreement (2AC ¶¶ 47–56);[17]

Count 5: breach of the May 2009 retainer agreement (2AC ¶¶ 57–63);

Count 6: reformation of the promissory note and security agreement (2AC ¶¶ 64–73);

Count 7: equitable lien (2AC ¶¶ 74–79).

Defendants' answer to the 2AC contains four counterclaims:

Count A: damages under Illinois UCC § 9–625(b) (810 ILCS 5/9–625) for acting without a commercially reasonable disposition under Illinois UCC 9–610 (810 ILCS 5/9–610);

Count B: damages under Illinois UCC § 9–625(e)(3) for violating Illinois UCC § 9–509 (810 ILCS 5/9–509) by filing a financing statement without authority;

Count C: damages under Illinois UCC § 9–625(e)(4) for failing to file a termination statement as required by Illinois UCC § 9–513(c)(4) (810 ILCS 5/9–513);

Count D: damages under Illinois UCC § 9–625(c)(2) for failing to comply with secured party's UCC obligations in regards to consumer goods.

---

[16] Count 3 is not entirely clear, but this is my interpretation of the claim intended to be asserted.

[17] This is the count that was dismissed by Judge Sheridan. Mac Naughton continues to allege it to "preserve appellate review." (2AC at 8 n.1)

## II.   MOTIONS DIRECTED TO THE SEVEN CLAIMS IN THE 2AC

Mac Naughton, as plaintiff, moves for summary judgment on counts three, six and seven of the 2AC. (*See* Pl MSJ Br.) He acknowledges that, should summary judgment be granted as to count three, then counts one, two and five of the 2AC can be dismissed without prejudice as moot. (Pl MSJ Br. 39 & n.15; Pl Opp. MSJ 9 n.7) Defendants make mirror-image motions for summary judgment dismissing all counts of the 2AC. They also move to dismiss the 2AC for lack of standing, claiming that Mac Naughton has assigned all of his claims to another entity.

### A.   Motion to Dismiss for Lack of Standing

Defendants bring a motion to dismiss the second amended complaint, contending that Mac Naughton lacks standing because he assigned his claims. I will treat it as a Rule 12(b)(1) motion.

In their opening brief, defendants cite to exhibits that they do not attach. (Def MTD at 1–2) To their reply brief defendants attach a complaint from a different matter (Def MTD Reply Ex. 1). Defendants claim that this complaint demonstrates that Mac Naughton has assigned all of his claims to another entity. They do not attach or cite to the assignment itself, and the exhibit is submitted improperly as a mere attachment to a brief. What is more, defendants have slipped this material into their reply, giving plaintiff no opportunity to respond to it. Defendants have not attempted to support their contentions factually, nor have they incorporated them into their summary judgment motions or opposition.[18]

---

[18] If I were to consider that complaint, I could not give it the significance that defendants assign to it. Count 1 of that complaint alleges that "Plaintiff Mac Naughton has assigned to Plaintiff Casco Bay his claims for breach of the Non-Assignment Clause and First Amended Security Agreement by Defendant USA Satellite arising out of the Leydig Assignment as stated in this Count." (ECF no. 391 at 14 ¶ 49) The claim "stated in this Count" is that "USA Satellite breached the Non-Assignment Clause and First Amended Security Agreement by directing and authorizing the Leydig

In short, there is no clear showing that would permit dismissal of the 2AC on standing grounds.

### B. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000).

In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S. Ct. 2548 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual

---

Assignment." (*Id.* ¶ 47) That appears to involve a judgment owed to USA Satellite, in which Mac Naughton believes he possesses a security interest. If Mac Naughton had a security interest, it must be by virtue of the security agreement (which Judge Sheridan found to be unenforceable as supergeneric) or the second security agreement that Mac Naughton purported to sign on defendants' behalf (which Judge Salas declined to consider as the basis for claims in this action). At any rate, whatever all this may mean, it stops far short of a total assignment of claims that would deprive Mac Naughton of standing to pursue the debt here.

evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## C.  Count 3: Breach of the Promissory Note

The parties do not dispute that they both signed the promissory note. Defendants argue, however, that they signed the agreement under duress and that they have paid their debt to Mac Naughton.

### 1.  Duress

Under New Jersey law,[19] a contract is voidable based on duress if a contracting party is deprived of the exercise of free will because of wrongful pressure or threats. *Rubenstein v. Rubenstein*, 120 A.2d 11, 13–15 (N.J. 1956). "The act or conduct complained of need not be 'unlawful' in the technical sense

---

[19] The promissory note and the security agreement both require consent to jurisdiction in New Jersey courts for all matters arising out of their enforcement. (Pl MSJ Ex. L); *see Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–04, 102 S. Ct. 2099, 2105 (1982). Additionally, the parties appear to agree that New Jersey law governs, and cite New Jersey law as to all matters regarding the contract.

of the term; it suffices if it is wrongful in the sense that it is so oppressive under given circum[s]tances as to constrain one to do what his free will would refuse." *Id.* at 15 (internal quotation marks and citations omitted). In defining "economic duress," the Supreme Court of New Jersey has stated "that the 'decisive factor' is the wrongfulness of the pressure exerted." *Cont'l Bank of Pa. v. Barclay Riding Acad., Inc.*, 459 A.2d 1163, 1175 (1983).[20] "Economic duress" is a difficult term to define, but the wrongfulness of the threat is an appropriate place to start the analysis.

There is no "simple formula" to determine if a threat is wrongful, but the New Jersey Supreme Court has looked to hornbook law for guidance:

> One point has tended to become more certain: Where there is adequacy of consideration, there is generally no duress.... Whenever a party to a contract seeks the best possible terms, there can be no rescission merely upon the grounds of "driving a hard bargain." Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion.... Under this rule, the party exerting pressure is scored only for that for which he alone is responsible.

*Cont'l Bank*, 459 A.2d at 1175–76 (quoting 13 Williston, Contracts § 1617 at 708 (3d ed. 1970)). *See also Rubenstein*, 120 A.2d at 14–15 (citing the Restatement of Contracts and Williston in a case about threats of gangster violence and arsenic poisoning); *Miller v. Eisele*, 168 A. 426, 429–30 (1933)

---

[20] The Supreme Court of New Jersey quoted 13 Williston, Contracts § 1617 at 704 (3d ed. 1970)) to define economic duress: "1. [t]he party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and 2. [s]uch act or threat must be one which deprives the victim of his unfettered will." *Id.*

Whether the person had an adequate alternative remedy in the courts is a relevant factor, but has been given reduced weight in recent case law. The Supreme Court of New Jersey prominently featured the "adequate remedy" element in *Ross Sys. v. Linden Dari-Delite, Inc.*, 173 A.2d 258, 261 (N.J. 1961) ( "Payments are made under duress when they are induced by the wrongful pressure of the payee and the payor has no immediate and adequate remedy in the courts to resist them."). In *Cont'l Bank*, the Court did not overrule *Ross Sys.* or invalidate the "adequate remedy" factor, but marginalized it to some degree.

(citing the Restatement of Contracts in a case about duress resulting from the stock market crash of 1929).

The Restatement (Second) of Contracts lists two types of threats that are potentially relevant here:

(1) A threat is improper if

...

(c) what is threatened is the use of civil process and the threat is made in bad faith[21]

...

(2) A threat is improper if the resulting exchange is not on fair terms, and

(a) the threatened act would harm the recipient and would not significantly benefit the party making the threat....

Restatement (Second) of Contracts § 176 (1981).

Comment d of the Restatement defines the section (1)(c) requirement of "bad faith":

The policy in favor of free access to the judicial system militates against the characterization as improper of threats to commence civil process, even if the claim on which the process is based eventually proves to be without foundation. Nevertheless, if the threat is shown to have been made in bad faith, it is improper. Bad faith may be shown by proving that the person making the threat did not believe there was a reasonable basis for the threatened process, that he knew the threat would involve a misuse of the process or that he realized the demand he made was exorbitant.

Restatement (Second) of Contracts § 176 cmt. d (1981).

---

[21] A threat to sue a debtor for collection is the classic form of this type of threat. *See Warner-Lambert Pharm. Co. v. Sylk*, 471 F.2d 1137, 1144 (3d Cir. 1972) ("New Jersey cases have held that threats of legal proceedings to be instituted unless a party executes a certain paper do not of themselves amount to legal duress."). But threats while litigation is ongoing, like those here, also require bad faith in order to be considered improper. *See Shine v. TD Bank Fin. Grp.*, No. CIV. 09–4377, 2011 WL 3328490, at *6 (D.N.J. Aug. 2, 2011) (no impropriety where there is "a legal right to *pursue* attorneys' fees, costs, and sanctions.").

Comment f gives some insight into the kind of quasi-blackmail that may fall under section (2)(a). "A typical example is a threat to make public embarrassing information concerning the recipient unless he makes a proposed contract." Restatement (Second) of Contracts § 176 cmt. f (1981).

Defendants claim that Mac Naughton overcharged them and then threatened them with embarrassing revelations in his motion to withdraw from representation in the Illinois action if they did not pay. Mac Naughton admits that he conveyed to Korniczky, defendants' attorney, that he might reveal to the Illinois federal court the bounced checks and the violation of the escrow order. (Pl Facts ¶ 37; Def Facts ¶ 9; Def Opp. MSJ at 5) Harmelech, testifying on behalf of Cable America, claimed he was scared because he was "going to look like shit in front of the judge." (30(b)(6) Dep. 235:25–236:14)

I pause to note that this is not a case of an attorney's taking advantage of his client's lack of legal acumen. Cocounsel, Korniczky, represented Harmelech and Cable America in their negotiations with Mac Naughton over the unpaid fees, and the "threat" seems to have been addressed to him. (Pl Facts ¶ 31) The parties' dealings must be considered in that context.

Under 1(c), for the threat to be wrongful, Mac Naughton had to believe that there was no reasonable basis for the threatened action. *See* Restatement (Second) of Contracts § 176 cmt. d (1981). Under 2(a), the threatened action must have been calculated to harm defendants without significantly benefiting Mac Naughton. *See id.* at cmt. f. Mac Naughton had a good faith reason for his threat of revealing the bounced checks in his motion to withdraw. A lawyer cannot withdraw from a pending case without leave of the court. The lawyer must establish good cause, and even then may be ordered to remain.[22] In his

_____

[22] The local rules in the United States District Court for the Northern District of Illinois require an attorney of record to obtain leave from the court before withdrawing. N.D. Ill. R. 83.17. Further, Illinois Rule of Professional Conduct 1.16 governs declination or termination of representation of a client. In relevant part, it states:

deposition, Mac Naughton explained that the particular judge involved was unsympathetic to the bare argument that the lawyer was not being paid. The bounced checks were part and parcel of the fact that he had not been paid. Mac Naughton felt that the bounced checks would impress upon the court that there were "irreconcilable differences" that made withdrawal appropriate. (Mac Naughton Dep. 96:15–97:4) In short, this was more than mere failure to pay; this could be construed as a client's fraudulent behavior toward the lawyer. To

---

(b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if:

(1) withdrawal can be accomplished without material adverse effect on the interests of the client;

(2) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;

(3) the client has used the lawyer's services to perpetrate a crime or fraud;

(4) the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement;

(5) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;

(6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or

(7) other good cause for withdrawal exists.

(c) A lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

cite it in connection with a motion to withdraw (or to state that one will do so) meets the 1(c) test of good faith. It also meets the 2(a) test of being not gratuitously harmful, but beneficial to Mac Naughton. Mac Naughton obviously would suffer financially if he were forced to continue to work without being paid. Defendants do not put forward any affidavit or evidence to the contrary.

Mac Naughton further argues that he was within his rights under the Illinois and New Jersey Rules of Professional Conduct ("RPC") to threaten to reveal defendants' confidences in order to collect a bill. (Pl MSJ Br. 14–15) The Illinois RPC permits lawyers to reveal information, *inter alia*, "in a controversy between the lawyer and the client" and "to comply with other law or a court order." Ill. RPC R. 1.6(b)(5–6); *see also* N.J. RPC R. 1.6(d)(2, 4). "A threat to do that which one has the legal right to do does not constitute duress unless the right is abused or the threat made in bad faith." 28 Williston on Contracts § 71:26 (4th ed.); *see also Shine*, 2011 WL 3328490, at *6 (threats within a litigation are not improper where there is "a legal right to *pursue*" the threatened activity). True, "conduct may be legal but still oppressive." *Cont'l Bank*, 459 A.2d at 1175. I find however, that Mac Naughton's informing the court that defendants gave him bad checks does not approach that standard of oppressiveness. Nor is it wrongful to threaten to reveal that the defendants had not complied with the court's escrow order. Indeed, Mac Naughton as an officer of the court may have had a duty to report his client's disobedience of the court's order. At any rate, if Mac Naughton had been exceeding his legal rights, it would have been natural for Korniczky as counsel to say so, and to resist.

Defendants' claim that Mac Naughton's fee was too high, or that they had no choice but to sign the agreement, rings especially hollow given the availability of fee arbitration. Mac Naughton advised defendants of their right to fee arbitration pursuant to New Jersey Court Rule 1:20A. (Pl MSJ Ex. E.1) At his deposition, Harmelech stated that he did not pursue fee arbitration "because it would take too long" and "looked complicated." (Harmelech Dep. 142:24–143:12) Defendants refused to arbitrate Mac Naughton's fees and

instead chose an alternative solution: to put Mac Naughton off by signing the promissory note and agreeing to pay him over time. Defendants are in litigation because they very quickly abandoned the bargain they had made.

### 2. Payments

Defendants do not factually support their claim that they have paid their debt under the promissory note. Defendants claim to have paid $10,000 on June 26, $2,400 on July 29, $5,000 on August 15, $8,500 on November 27, and $5,000 on December 29, all in 2009. They claim to have paid $6,100 on November 18, 2010. (See Def Facts ¶ 27; Mac Naughton Cert. ¶ 15; Pl Facts ¶¶ 60, 76) For purposes of this motion, I take those representations as true.

The promissory note was signed on August 12, 2009. The first two payments, which predated the promissory notes, were not applied toward it. The remaining payments, which came after, were applied to the balance of the note. Thus the payment of $5,000 on August 15th was credited to the note balance, reducing it from $65,879 to $60,879. (See Pl Facts ¶ 40; Pl MSJ Ex. Z) Likewise, the remaining payments ($19,600 in all) were credited against the balance due on the promissory note. (See Pl MSJ Ex. Z)

Defendants' claims that they were overcharged for legal services do not raise a genuine, material issue. Count 3 is a suit on the promissory note, not a claim of breach of the retainer agreement. If defendants contested the underlying charges for services, they (on their own or through their counsel, Korniczky) could have declined to sign the note, or they could have instituted fee arbitration. They did not; instead, they entered into a binding agreement to pay, which they breached. The promissory note is valid and not voidable. Defendants have breached it by failing to pay plaintiffs according to its schedule. I grant summary judgment to Mac Naughton and deny summary judgment to defendants on count three.

Counts one, two, and five are alternative theories for collection of the same amounts sought under count three. Mac Naughton has stated that, if summary judgment is awarded on count three, then counts one, two, and five

are rendered redundant, and he will consent to their dismissal. (Pl MSJ Br. 39 & n.15; Pl Opp. MSJ 9 n.7) I will therefore dismiss counts one, two, and five without prejudice.

### D.   Count 6: Reformation of the Security Agreement

Mac Naughton asks the Court to reform the security agreement to correct the portion that Judge Sheridan previously found invalid. *See Mac Naughton*, 2010 WL 3810846, at *4-5 (ECF No. 35 at 8–10). Judge Salas has all but rejected this attempt to unilaterally reform the security agreement. (ECF No. 167 at 4–7) I nevertheless consider Mac Naughton's argument.

Mac Naughton contends that a unilateral mistake can be a basis for reformation of a contract when the non-mistaken party knew about the mistake and kept silent. (Pl MSJ Br. § III.D) Mac Naughton's view is not in accord with New Jersey law.

*Mutual* mistake is of course a recognized basis for reformation of a contract:

> Reformation predicated upon mutual mistake requires that both parties are in agreement at the time they attempt to reduce their understanding to writing, and that the writing fails to express that understanding correctly.... A general understanding that A will purchase and B will sell some land-the identity, location and extent to be subsequently determined-cannot be the basis for reformation. The reason is because no understanding has been reached with respect to the essential terms of the contract. Implicit in the general understanding is the recognition that when the parties arrive at the point of preparing an enforceable contract they will specify the precise property to be conveyed.

*St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden*, 443 A.2d 1052, 1056 (N.J. 1982). But no claim of mutual mistake is made here.

Unilateral mistake is a far narrower basis for reforming a contract. It requires "unilateral mistake by one party and fraud or unconscionable conduct by the other." *Id.* at 1055. *See also Brodzinski v. Pulek*, 182 A.2d 149, 153 (N.J. Super. Ct. App. Div. 1962) ("[W]hen the written instrument fails to express the real agreement or transaction ... through the mistake of one party accompanied

by the fraudulent knowledge and procurement of the other, there may be reformation." (internal quotation marks and citations omitted)) Mac Naughton gets off on the wrong foot in asserting that mere knowledge of the mistake and silence is sufficient. Silence is not sufficient; the unilateral mistake doctrine requires "fraud or unconscionable conduct." Mac Naughton has failed to establish such unconscionable conduct. [23]

Indeed, even unconscionable conduct, standing alone, will not suffice. "[T]here must be clear and convincing proof that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be; and as, in fact, it was but for the alleged mistake in its drafting." *Brodzinski*, 182 A.2d at 153 (internal quotation marks and citations omitted)); *see also St. Pius,* 443 A.2d at 1056. Mac Naughton does not demonstrate that the parties had any intent whatever as to the status of the miscellaneous collateral that he now wishes to bring within the scope of the amended security agreement.

Finally, even in established cases of unilateral mistake, reformation is discretionary, not mandatory. *Raiczyk v. Ocean Cnty. Veterinary Hosp.*, 377 F.3d 266, 270 (3d Cir. 2004).

> It is well established that in order to rescind or reform an agreement on the basis of a unilateral mistake, the following essential elements must each be present: (1) the mistake must be of so great a consequence that to enforce the contract as actually made would be unconscionable; (2) the matter as to which the mistake was made must relate to the material feature of the contract; (3) the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake, and (4) the relief afforded must not seriously prejudice the other party, except for loss of his bargain.

---

[23] Mac Naughton cites *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 180 (3d Cir. 1992). That case, however, interprets Pennsylvania law. Mac Naughton also cites to the Chancery Division opinion in *Brodzinski v. Pulek*, 174 A.2d 907, 911 (N.J. Super. Ct. Ch. Div. 1961) The Appellate Division opinion, however, states New Jersey law just as it is laid out in *St. Pius, supra. Brodzinski*, 182 A.2d at 153.

*Fleming Companies, Inc. v. Thriftway Medford Lakes, Inc.*, 913 F. Supp. 837, 843 (D.N.J. 1995); *accord Raiczyk*, 377 F.3d at 270 ("The power of reformation should be used only when the mistake is material, when there would not be prejudice to the other party (besides the loss of the bargain), and upon a showing that the plaintiff exercised reasonable care.") Mac Naughton has not demonstrated any of those discretionary factors. He drafted this security agreement and pressed it upon defendants; the responsibility for its defects is his, and he cannot show that the equities tip in his favor.

For all of these reasons, I deny Mac Naughton's motion for summary judgment on count six, and grant defendants' mirror-image motion for summary judgment dismissing count six.

## E.   Count 7: Equitable Lien

Mac Naughton makes a final attempt to salvage a security interest by requesting that the Court impose an equitable lien on all of defendants' personal property. (Pl MSJ Br. § III.E)

In New Jersey,[24] an equitable lien "may be created by express executory contracts relating to specific property ... [and] according to the dictates of equity and conscience ... in certain cases where contribution or reimbursement is enforceable in equity, including those involving fraud and innocent mistake." *Temple v. Clinton Trust Co.*, 62 A.2d 690, 693 (N.J. 1948). "'The whole doctrine of equitable liens or mortgages is founded upon that cardinal maxim of equity which regards as done that which has been agreed to be, and ought to have been, done.'" *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 522 (N.J. 1994)

---

[24] Mac Naughton cites some Illinois law to support his argument. (Pl MSJ Br. 21–24) Illinois law, like New Jersey law, provides that an equitable lien may arise either from an express agreement regarding specific property or as a result of more general equitable considerations. *Shchekina v. Washington Mut. Bank*, No. 08 C 6094, 2012 WL 3245957, at *6 (N.D. Ill. Aug. 7, 2012) (quoting *Paine/Wetzel Associates, Inc. v. Gitles*, 528 N.E.2d 358, 360 (Ill. App. Ct. 1988)).

23

(quoting *Rutherford Nat. Bank v. H.R. Bogle & Co.*, 169 A. 180, 182 (N.J. Ch. 1933)).

The security agreement never specified the property in which Mac Naughton desired a security interest. Mac Naughton, the drafter, merely provided that he wanted a security interest in any and all property.

Furthermore, the equities do not favor Mac Naughton's position. He wrote the agreement and pressured defendants to sign it. (Mac Naughton Cert. ¶ 24; *see* note 6, *supra*). In connection with getting them to sign, he boasted of his expertise: "getting and collecting on judgments is a subject I know a lot about." (Pl MSJ Ex. G) It would not be equitable to repair a mistake foisted on the other side by the mistaken party, Mac Naughton, for his own benefit. Thus, I deny Mac Naughton's request for summary judgment on count seven and I grant defendants' corresponding summary judgment motion to dismiss count seven.

## III.   MOTIONS DIRECTED TO THE FOUR COUNTERCLAIMS

The defendants' four counterclaims, brought under the Illinois version of the UCC, all relate to Mac Naughton's efforts to obtain a security interest in aid of collection of his fee. Defendants move for summary judgment on the first three counterclaims; Mac Naughton, as counterclaim defendant, moves for summary judgment dismissing all four.

### A.   Counterclaim A: Damages Under 810 ILCS 5/9–625(b)

Defendants seek damages under 810 ILCS 5/9–625(b) for acting without a commercially reasonable disposition under 810 ILCS 5/9-610.

Section 9–610(b) requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." 810 ILCS 5/9-610(b). Further, section 9-625 is titled "Remedies for secured party's failure to comply with Article." Subsection (b) states that "a person is liable for damages in the amount of any loss caused by a failure to comply with this Article." 810 ILCS 5/9-625(b). Defendants

claim that Mac Naughton's assertion of an unenforceable security interest was commercially unreasonable. (Def MSJ Br. 18) The parties cite no case law on point and the Court is aware of none.

It is true that Mac Naughton sought to assert his security interest on the terms mutually agreed to by the parties. He abandoned his attempt to dispose of the property through auction, however, four days after defendants sent him a letter contending that the security interest was invalid. (Pl Facts ¶¶ 69, 72) There is no contention that, before receiving the letter, Mac Naughton took any action inconsistent with a belief that he had a valid security interest.[25] At any rate, there has been no "disposition of collateral," reasonable or otherwise, to which this statute would apply.[26] Thus I will grant Mac Naughton's motion for summary judgment as to defendants' first counterclaim and deny defendants' corresponding motion.

## B. Counterclaim B: Damages Under 810 ILCS 5/9–625(e)(3)

Defendants seek damages under 810 ILCS 5/9–625(e)(3) for violating 810 ILCS 5/9–509 by filing a UCC–1 financing statement without authority. Section 9-625(e)(3) grants statutory damages for each instance that a person files a financing statement without authority. 810 ILCS 5/9–625(e)(3).

Section 9-509 permits the filing of an initial financing statement if, *inter alia*, "the debtor authorizes the filing in an authenticated record or pursuant to subsection (b)" 810 ILCS 5/9-509(a). Subsection (b) states, in relevant part,

---

[25] "Commercial reasonableness is generally a question of fact and thus is not appropriate for determination on a motion for summary judgment. However, where facts are undisputed, the question of reasonableness becomes one of law." *In re Estate of Nardoni*, 2014 IL App (1st) 131075-U, 2015 WL 1514908 at *8 (Ill. App. Ct. March 31, 2015) (internal citation omitted).

[26] The record for these motions contains only the original security agreement. Defendants also complain that Mac Naughton, even after terminating the auction, acted unreasonably in contacting their customers. The subject matter of this statute, however, is confined to dispositions of property, and no such disposition is alleged.

"[b]y authenticating or becoming bound as debtor by a security agreement, a debtor or new debtor authorizes the filing of an initial financing statement."

Here, there was of course a security agreement. (Pl MSJ Ex. L at 3 ¶ 1) The court was provided no relevant case law, and found none, regarding a financing statement based on a security agreement later held invalid because of a supergeneric description of property. Mac Naughton filed the financing statement on August 12, 2009, immediately after the security agreement was finalized. (Pl. Facts ¶ 46; Pl MSJ Ex. M) At that point, the security agreement had just been mutually agreed to, and had not been challenged or found invalid. Judge Sheridan did not rule that the language was supergeneric until September 22, 2010. (Def Facts ¶ 22) Because Mac Naughton was currently authorized to file the financing statement when he filed it on August 12, 2009, he did not violate section 9–625(e)(3). I grant Mac Naughton's motion for summary judgment dismissing defendants' second counterclaim and deny defendants' corresponding motion.

### C.  Counterclaim C: Damages Under 810 ILCS 5/9–625(e)(4)

Defendants seek damages under 810 ILCS 5/9–625(e)(4) for failing to file a termination statement as required by 810 ILCS 5/9–513(c)(4).

Section 9–513(c) states:

> (c) Other collateral. In cases not governed by subsection (a), within 20 days after a secured party receives an authenticated demand from a debtor, the secured party shall cause the secured party of record for a financing statement to send to the debtor a termination statement for the financing statement or file the termination statement in the filing office if:
>
> ...
>
> (4) the debtor did not authorize the filing of the initial financing statement.

810 ILCS 5/9-513. Section 9-625(e)(4) grants statutory damages for each instance that a person fails to file a termination statement as required by section 9-513. 810 ILCS 5/9–625(e)(4).

Defendants demanded a termination statement from Mac Naughton in their October 16, 2009 letter (2AC Ex. E at 3), and again on October 15, 2010, after Judge Sheridan's ruling (Def Facts ¶ 24; Pl Response Facts ¶ 24). Mac Naughton has not filed a termination statement as to the financing statement filed on August 12, 2009. (Pl Facts ¶ 73)

Defendants, rightly or wrongly, "authorize[d] the filing of the initial financing statement." 810 ILCS 5/9–513(c)(4). Judge Sheridan's subsequent ruling does not change the fact that they signed the security agreement on which the initial filing was based. Defendants do not have a claim under section 9–513(c)(4). I grant Mac Naughton's motion for summary judgment dismissing defendants' third counterclaim and deny defendants' corresponding motion.

### D.   Counterclaim D: Damages Under 810 ILCS 5/9–625(c)(2)

Defendant seeks damages under 810 ILCS 5/9–625(c)(2) for failure to comply with a secured party's UCC obligations in regard to consumer goods. [27] "'Consumer goods' means goods that are used or bought for use primarily for personal, family, or household purposes." 810 ILCS 5/9-102. Harmelech, testifying on behalf of Cable America, stated that he and Cable America owned no consumer goods in Illinois. (30(b)(6) Dep. 169:14–170:11) Defendants provide no facts to contradict this, and they do not support their fourth counterclaim in any way. Thus, I grant Mac Naughton's motion for summary judgment on the fourth counterclaim.

---

[27] Defendants do not mention this fourth counterclaim in any of their briefing on either summary judgment motion. (*See, e.g.*, Def MSJ Br.; Def Opp. MSJ)

## IV.   CONCLUSION

Defendants' motion to dismiss the 2AC for lack of standing is **DENIED**.

As to count three of the 2AC, Mac Naughton's motion for summary judgment is **GRANTED,** and Defendants' corresponding motion for summary judgment is **DENIED**. Counts one, two and five of the 2AC are **DISMISSED** without prejudice as moot. Count four is **DISMISSED** for the reasons given by Judge Sheridan. (*See* ECF No. 35.) As to counts six and seven of the 2AC, Defendants' motion for summary judgment is **GRANTED** and Mac Naughton's corresponding summary judgment motion is **DENIED**.

Mac Naughton's motion for summary judgment is **GRANTED** as to all four of defendants' counterclaims. Defendants' corresponding motion for summary judgment as to their first three counterclaims is **DENIED**.

An appropriate order accompanies this Opinion.

Dated: July 13, 2016

**Hon. Kevin McNulty**
**United States District Judge**

28